T.C. Memo. 1997-54

UNITED STATES TAX COURT

STANLEY M. KURZET AND ANNE L. KURZET, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27982-91.                    Filed January 29, 1997.

<u>J. Gordon Hansen</u> and <u>Daniel M. Allred</u>, for petitioners.

<u>M.K. Mortensen</u> and <u>Mark H. Howard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies, additions
to tax, and accuracy-related penalties in petitioners' Federal
income taxes for 1987, 1988, and 1989, as follows:

| Year | Deficiency | Additions to Tax | | | | Accuracy-Related Penalty |
| | | Sec. 6651(a)(1) | Sec. 6653(a)(1)/ 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 | Sec. 6662(a) |
|---|---|---|---|---|---|---|
| 1987 | $440,539 | --- | $22,027 | * | $110,135 | --- |
| 1988 | 202,360 | --- | 10,118 | --- | 50,590 | --- |
| 1989 | 215,930 | $7,845 | --- | --- | --- | $43,186 |

\* 50 percent of interest due on portion of underpayment attributable to negligence.

In an Amendment to Answer, respondent increased the deficiency, addition to tax, and accuracy-related penalty for 1989 to $404,418, $17,269, and $80,883, respectively.

The primary issues for decision are: (1) Whether, during the years in issue, petitioners' ownership and management of a timber farm property near Coos Bay, Oregon, constituted a trade or business activity entered into for profit, as petitioners contend, or a personal, nonbusiness, not-for-profit activity, as respondent contends; (2) whether petitioners' investment in property in Tahiti constituted a for-profit investment under section 212; (3) the deductibility under section 162 or section 212 of expenses relating to petitioners' use of a Lear jet to travel, among other places, to their Oregon timber farm property and to their property in Tahiti; and (4) to what extent expenses of petitioners' residence in Orange, California, qualify as home office expenses under section 280A. Various additional and alternative issues are also for decision (e.g., if petitioners' timber farm constitutes a for-profit trade or business activity,

whether petitioners should be required to capitalize additional costs relating to the timber farm as part of the costs of a water reservoir).

Unfortunately, pretrial, trial, and posttrial proceedings in this case are marked by miscommunication between the lawyers for the parties and by frequent allegations by one lawyer against another that there is misrepresentation of the facts and evidence. The inability of the parties' lawyers in this case to communicate effectively with each other resulted in the trial of issues that should have been settled and in the presentation of evidence and arguments in an untimely and confusing manner.

The Court spent hours with the parties' lawyers attempting to identify and articulate the various primary and alternative issues and arguments and the relationship of the issues to each other. Similar to much of the miscommunication between the parties throughout the pretrial and trial, arguments made in the parties' posttrial briefs are filled with unnecessary accusatory statements.

Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  At the time their petition was filed, petitioners resided in Park City, Utah.

Petitioner Stanley Kurzet (petitioner) was a successful inventor and businessman.  For many years, petitioner owned and personally managed ALS Corp. (ALS), a company based in southern California that petitioner founded in 1958 and that was involved in the design and manufacture, apparently for the U.S. military, of sophisticated electronic and engineering equipment.

ALS became extremely profitable and valuable.  In 1984, at the age of 53, petitioner sold the stock of ALS in an arm's-length transaction to an unrelated third party for $20 million in cash.

As part of the sale of ALS, petitioner entered into a limited, 7-year consulting agreement with the new owners of ALS to be available to consult with the new owners in the continuing management of ALS, and petitioner entered into a broad covenant not to compete with ALS.  The covenant not to compete prohibited petitioner from engaging in any business or investment activity relating, in any way, to the type of engineering work and business in which ALS was engaged and severely restricted petitioner's ability to engage in any business or for-profit activity that related, in any way, to petitioner's prior work and experience at ALS.

As a result of a number of factors (namely, the $20 million that became available to petitioners on the sale of ALS, the consulting agreement that required little of petitioner's considerable skill, experience, and time, the broad restrictions on petitioner's activities to which petitioner became subject under the covenant not to compete, and petitioner's relatively youthful age and vigor), after the sale of ALS in 1984, petitioner began an extensive and businesslike investigation of business and investment opportunities in which the approximately $20 million that petitioners had available might appropriately be invested and to which petitioner might apply his considerable business talent. Petitioner personally consulted with various experts and obtained advice regarding market trends and types of industries that might have unique and positive growth and appreciation potential.

Over the course of the next few years and as a result of various activities, investments, and companies in which petitioners invested and were involved, petitioners earned and realized very significant income. Assets in which petitioners invested appreciated significantly, some of which appreciation petitioners have realized and some of which, as of the time of trial, petitioners have not yet realized because the assets are still held by petitioners. Over the years, petitioner has demonstrated a skill and talent for making a profit.

After selling ALS in 1984, the primary activities and assets in which petitioners invested and participated and that are at issue in this case involve timber farming in Oregon, real property in Tahiti, a Lear jet, a limited consulting business based in southern California, and a computer and real estate rental business based in southern California.  Petitioners incurred significant expenses associated with each of these activities and businesses, and petitioners, on their books and records and on their joint Federal income tax returns, treated most of the expenses relating to these activities and businesses as deductible expenses of a trade or business.

Apparently due to errors made by petitioners and to careless income tax return preparation by petitioners' accountants and tax return preparers, numerous errors and mistakes in classification of the expenses relating to the above activities occurred on petitioners' original books and records and on petitioners' Federal income tax returns.

On audit, respondent made blanket determinations that essentially all of petitioner's activities constituted personal, nonbusiness, and not-for-profit activities.  Respondent's blanket determinations, combined with the errors that occurred on petitioners' books and records and Federal income tax returns, resulted in the disallowance of many of the expenses claimed on petitioners' Federal income tax returns for the years in issue and in respondent's determination of the substantial income tax

deficiencies, additions to tax, and accuracy-related penalty set forth above.

Prior to and during trial in this case, petitioners' representatives submitted to respondent on behalf of petitioners a number of "proposed revised" Federal income tax returns for each of the years in issue that attempt to correct or clarify some of the classification errors that occurred on petitioners' original income tax returns. Respondent argues that petitioners' proposed revised income tax returns are confusing and inconsistent, and perpetuate many of the errors made in petitioners' original income tax returns, that petitioners' proposed revised income tax returns should be ignored, and that petitioners' original income tax returns should be the focus of our analysis.

We disagree with respondent, in significant part, on this point. In the many instances where petitioners' proposed revised Federal income tax returns reflect additional items of income or reductions in amounts claimed as expenses on petitioners' original Federal income tax returns and/or the reclassification of expenses consistent with classifications made by respondent in respondent's notice of deficiency, petitioners' proposed revised Federal income tax returns, with regard to such items, are to be treated as concessions by petitioners.

Where petitioners' proposed revised returns reflect reductions in petitioners' alleged income or increases in claimed

expenses, as compared with petitioners' original Federal income tax returns as filed with respondent, petitioners' proposed revised returns, with regard to these new items and issues, are to be ignored except to the extent that petitioners have filed with the Court amendments to their pleadings to properly raise new issues with regard to such alleged reductions in income and alleged increases in expenses.  Rule 41.

We also note that as a result of information provided by petitioners to respondent during the course of the audit and litigation, including the proposed revised returns, respondent has significantly revised and lowered her original deficiency determinations against petitioners.

Timber Farm

Prior to 1984, petitioner had no experience in the timber industry, in farming, or in cattle raising.  Petitioner, however, in 1984 and 1985, after receiving approximately $20 million from his sale of ALS, investigated and consulted with a number of real estate and forestry experts about the timber industry and forestry management.

Specifically, with regard to 621 acres of timber property in Coos County, Oregon (timber farm), petitioner inspected the timber farm and the trees growing thereon with real estate agents and forestry experts.  Petitioner and the experts considered the type and quantity of trees growing on the timber farm, the type

of soil and terrain, the expected growth rate of the trees, and water resources on the timber farm.

Petitioner also studied information received from the U.S. Forest Service relating to tree growth and management.

After inspecting the timber farm and conferring with experts and after considering the financial risks and profit potential, in June of 1985 petitioners purchased for $568,890 in cash the timber farm in Coos County, Oregon.

The timber farm included 454 acres of forest land covered primarily with Douglas fir and spruce trees, 152 acres of bottom land, a number of barns, sheds, and three small houses.

In 1985, the Douglas fir, spruce, and other trees located on the timber farm were of an average age of 30 to 40 years. The trees were just reaching their peak growth rate, growing at a rate of approximately 10 percent per year.

Petitioner agreed to the $568,890 purchase price for the timber farm based on his analysis that, as of the time of purchase in June of 1985, the cumulative value of the standing timber on the timber farm, of the land, and of the existing buildings and improvements totaled approximately $750,000.

For many years prior to 1985, the timber farm that petitioners purchased was considered timber farm property on which trees had been grown, cut, and commercially logged. The prior owners of the timber farm last conducted a major harvest of

timber on the timber farm in 1945.  The most recent harvest of timber on the timber farm occurred in 1975.

Douglas fir and spruce trees are typically cut or harvested by commercial foresters once every 35 to 60 years.

In prior years, the timber farm also was used to raise cattle and as a dairy farm.

Petitioners' timber farm was typical of other timber farm property located along the Oregon coast.  Such timber farm property is typically used to grow and cut timber, to grow hay, and to raise cattle.  Typically, timber farmers make the decision when to cut and harvest timber based on the price of timber and their individual financial needs.

Petitioners' timber farm is bordered on all sides by commercial timber property, most of which is owned by Georgia Pacific Corp., which has been commercially cutting and harvesting timber on the adjacent property for a number of years.

At the time of petitioners' purchase of the timber farm, the roads, houses, and barns located on the timber farm were in significant disrepair and were inadequate for continued occupancy.

Petitioner initiated many projects to improve the timber farm.  The small houses and barns were repaired and improved. Poisonous plants in the pastures were eradicated and a water reservoir was constructed.  Junk cars and junk farm machinery located on the timber farm were removed and hauled to the dump.

In western Oregon, because of the wet climate and high rainfall that occur during the winter months, owners of timber farm property with main roads running through it that are "in place" and "hardened off" --- which takes a year or two after construction -- have a significant marketing advantage because they are able to cut and harvest timber on their property in winter and on short notice, and can thereby take better advantage of short or sudden swings in the price of cut timber.

Accordingly, after purchase of the timber farm, petitioner made a particular effort to improve the roads on the timber farm. Petitioner incurred many expenses and hired employees to repair and improve the existing roads and to construct new roads so as to be in a position, in subsequent years, to cut and harvest timber on the timber farm on short notice and thereby take advantage of favorable prices for cut timber.

Petitioner also initiated construction of a large new building for a machine shop and installation of a mobile unit and related water system.

Rather than hire expensive contractors to come onto the timber farm to perform the many repair, improvement, and construction projects that petitioner initiated, petitioner himself designed and performed much of the work on the timber farm. Petitioner himself often operated graders and other heavy equipment on the timber farm in repairing and improving the

roads, in constructing new roads, and in constructing the water reservoir.

In 1986, 1987, and 1988, petitioner made significant expenditures of his own time and money to repair buildings, to improve and construct 5 miles of roads, to grade fields, and to install several miles of pipes.

For the various projects that were undertaken and also for security on the timber farm, petitioner hired two employees to live and work on the timber farm. These employees were experienced farmers, timber men, and carpenters. Petitioner and his employees had to constantly watch for and keep off of the timber farm individuals who would attempt to trespass on the property to strip cedar trees, to pick mushrooms, and to grow marijuana.

During these years in which petitioner was building roads and improving and maintaining the timber farm for purposes of eventual cutting and harvesting of timber, Georgia Pacific, on its adjacent timber property, was building more miles of roads per acre than petitioner built on his timber farm.

The principal risk to a mature stand of timber is fire. During the years before us, petitioner and his employees had to fight one fire on the timber farm which destroyed 1½ acres of timber before the fire was extinguished.

As mentioned, in 1987 and 1988, in order to establish a source for additional water to protect trees on the timber farm

from fire and to provide irrigation for hay and cattle, a water reservoir was constructed on the timber farm by excavation of earth abutting a creek. The water reservoir was to be no higher than the original stream flow, 5 to 15 feet deep, and no dam was to be constructed. In 1988, the reservoir first filled with water and became available as a source of water for fighting forest fires.

Due to weather and erosion damage, in subsequent years the water reservoir had to be regraded and refilled a number of times. No permit was needed to use the water in the reservoir to fight forest fires.

On a ridge above the reservoir, petitioner also excavated a pond and constructed a windmill with the intent of using electricity produced from the windmill to pump water from the reservoir up to the pond so that a helicopter with a dip bucket could scoop water up from the pond to fight fires.

The use of water reservoirs or ponds as a source of water to fight fires was a common practice in this part of Oregon, and the reservoir and pond excavated on petitioners' timber farm were suitable for that purpose. Weyerhaeuser Corp. constructed 70 or 80 ponds, and the U.S. Bureau of Land Management constructed over 200 ponds in western Oregon to aid in fighting forest fires.

Construction of an elevated pond and pumping water up to the pond via power generated from a windmill, however, do not constitute improvements typical of Oregon timber property.

Petitioners did not submit applications to the State of Oregon for permission to perform the land excavation relating to construction of the water reservoir until 1988, and permission was not received from the State of Oregon until September of 1990.

Further excavations and improvements to the water reservoir were the primary construction project on which petitioners and his employees worked in 1989.

Rather than rent the numerous pieces of farm equipment and machinery needed for the various projects that petitioner and his employees personally undertook on the timber farm, during the years before us, petitioner traveled occasionally throughout Oregon and Washington to auctions of used farm equipment and machinery in order to acquire used equipment for use on the timber farm. Often, at the time of purchase by petitioner, such equipment was not operational, and petitioner personally and with his employees would rebuild and restore the equipment.

In 1985, petitioner purchased a used fire truck for use in protecting trees on the timber farm from fire. Petitioner purchased used equipment for harvesting, cutting, and baling hay, and chain saws and other equipment to cut timber. Petitioner purchased used machine shop equipment to maintain the machine shop on the timber farm so that petitioner and his employees could make, on the property, essentially all repairs to the farm

and other equipment without hiring expensive machinists and equipment repairmen.

Again, we note that petitioner purchased for the timber farm old and used farm and machine shop equipment because it was much cheaper than purchasing new equipment, because much of the equipment would not be used frequently on the property, and petitioner therefore had no need for new equipment, and because of petitioner's talent and competence in restoring and maintaining mechanical equipment.

Petitioner was able to acquire from auctions a large variety of used farm equipment, to restore the equipment, and, as of the time of trial, in the barns located on the timber farm, petitioner maintained in excellent condition and stored for use on the timber farm approximately 30 pieces of old but operational farm equipment. The parties and their experts are in agreement as to the excellent restoration and high quality maintenance of the equipment located on the timber farm.

From the time petitioners purchased the timber farm in June of 1985, until September 8, 1989, petitioners' primary residence was in Orange, California. From September 8, 1989, through the time of trial, petitioners' primary residence was in Park City, Utah.

Petitioners traveled to their Oregon timber farm approximately 4 or 5 times a year, and on each trip petitioners typically would spend a number of weeks on the timber farm. In

1987, 1988, and 1989, petitioners spent 127, 139, and 80 days, respectively, on the timber farm.

On the days on which petitioners were at the timber farm, petitioner worked constantly on the timber farm -- designing and planning repairs and improvements, personally operating heavy equipment such as graders, and working to improve and maintain roads and buildings, to clear brush, to build new roads for fire protection and for use in eventual harvesting of the timber.

When at the timber farm, Mrs. Kurzet worked on the records and other chores relating to maintenance of the timber farm, and petitioners generally worked from sunrise until sunset on various projects relating to the timber farm.

When petitioner was not working on the timber farm, petitioner would leave detailed written instructions for the employees to follow in his absence, listing priority projects on the timber farm on which the employees should work.

In 1985, petitioners purchased a modest mobile unit and placed it on the timber farm for use as an office and on-site sleeping accommodation for the days they were at the timber farm. Two of the rooms in the mobile unit were used as a computer room and work room in connection with the timber farm. One room was used as a bedroom for petitioners. The kitchenette and dining area were used frequently for paperwork, recordkeeping, meetings, and an office for the timber farm.

Petitioners made and paid for modest improvements to the mobile unit. From 1985 through 1989, petitioners' total cost for purchase of and improvements to the mobile unit was $147,643.

Petitioners have never stayed on or used the timber farm for personal purposes. Similarly, petitioners have never stayed overnight in the mobile unit for personal purposes. Petitioners remained in the mobile unit overnight only when they were at the timber farm to work on the various repair and improvement projects.

After purchasing the timber farm in 1985, petitioner continued to investigate, study, and consult with experts in the timber industry as to how to manage the timber farm. Petitioner spoke frequently with representatives of Georgia Pacific and observed how Georgia Pacific managed and harvested timber from its timber farm property adjacent to petitioners' timber farm. Petitioner often checked the market price for cut timber and evaluated whether any of the timber on the timber farm should be cut and sold.

In 1985 and 1986, soon after petitioners purchased the timber farm, timber prices fell dramatically in the United States and, until at least 1989, remained below the estimated costs petitioner would incur to harvest the timber. Accordingly, on advice of others in which he concurred, petitioner postponed the cutting, harvesting, and sale of any of the standing timber on the timber farm.

As explained by one of the timber experts with whom petitioner frequently consulted and with which explanation we agree --

> the age class of the timber when * * * [petitioners]
> bought the property was roughly 30 to 40 years old.  It
> was just reaching its peak in growth rate.  Quality was
> becoming better by natural pruning of the limbs, log
> diameters were increasing.  It was probably growing at
> 10 percent a year, so it had been -- the worst thing
> * * * [petitioners] could have done would have been cut
> the timber shortly after they bought the property,
> which the recruise shows now that that was the smart
> thing to do.  The volume's -- over doubled.

After 1989, even though prices for cut timber increased, petitioner has continued to postpone the cutting and sale of timber on the timber farm in part because the trees on the timber farm were approaching 60 years of age -- at which point in time trees move into a separate commercial class for trees over 60 years of age and increase in value by approximately 30 percent.

From the time of purchase in 1985, until the time of trial in 1995, the volume of timber in the trees on petitioners' timber farm has approximately doubled.

As of May of 1995, the assets on petitioners' timber farm have a fair market value of approximately $3,524,000, as set forth below:

| Timber Farm Assets | May 1995 Fair Market Value |
|---|---|
| Timber | $2,100,000 |
| Buildings and improvements | 908,000 |
| Equipment and machinery | 516,000 |
| Total | $3,524,000 |

Petitioners never raised any cattle or sheep on the timber farm, and, in approximately 1989, petitioners abandoned plans to raise cattle and sheep on the timber farm due to lack of adequate summer rainfall to sustain a second harvest of hay that the cattle and sheep would need.

There were no recreational amenities or activities of any kind on the timber farm -- no tennis court, no putting green, no swimming pool, no horses, no lake, no boating, no fishing, no recreational or resort facilities. The evidence is clear that petitioners' timber farm was not owned, operated, or used by petitioners for recreation, leisure, or other personal purpose.

Petitioner personally set up and maintained computerized accounting records with respect to expenses relating to the timber farm. As mentioned earlier, petitioners' records were not totally adequate, and expenses relating to the timber farm were often mislabeled or associated with the wrong activity. The evidence establishes, however, and respondent does not dispute, that all of the expenses claimed on petitioners' original Federal income tax returns and all of the expenses claimed on petitioners' proposed revised Federal income tax returns with respect to the timber farm were incurred and are fully substantiated -- as to amount and payment -- by petitioners' books and records.

From the time of purchase in 1985 through May of 1995, approximate total expenditures petitioners incurred and paid in connection with the timber farm -- as allocated by petitioners between petitioner's various activities and including petitioners' allocation for expenses of traveling to the timber farm in petitioner's Lear jet (as explained more fully below) but not including mere book items such as depreciation and recapture thereof --- are summarized below:

| Category of Timber Farm Expenses | Amount |
|---|---|
| Purchase Price of Timber Farm | $ 569,000 |
| Cost of Improvements to Land | 400,000 |
| Cost of Equipment and Vehicles | 625,000 |
| Maintenance and Operating Expenses | 1,160,000 |
| Lear Jet Operating Expenses | 428,000 |
| Cumulative 1985-May 1995 Expenses | $3,182,000 |

In summary, by May of 1995, the $3,524,000 total estimated fair market value of the timber located on petitioners' timber farm, of the land, of the buildings, of improvements to the land and buildings, and of the equipment and machinery purchased for use on the timber farm reflected an unrealized profit (before taxes) of approximately $342,000 over the total $3,182,000 that petitioner paid over the years to purchase, improve, and maintain the timber farm.

Tahiti Property

In 1984, petitioners purchased 5.5 acres (consisting of three adjacent parcels) of oceanfront property on the main island

of Tahiti for $1.1 million (Tahiti Property).  On the Tahiti Property during the years in issue, petitioners or others paid by petitioners remodeled and renovated a house, installed a solar water heating system, a spa, a culinary water system, and underground utilities, dredged a boat channel, added a satellite TV system, converted the electrical power system to 110 volts, installed a diesel power generator as an alternate source of electricity, and made many other significant improvements.

Petitioner personally designed and worked on many of the projects undertaken at the Tahiti Property.  Petitioner hired an individual to provide security for the property and to manage and pay repairmen and workmen hired to work on the property.

Generally, twice a year, petitioners traveled from California or Utah to the Tahiti Property.  Typically, on each trip, petitioners would stay at the Tahiti Property for a number of weeks.

To pay for costs incurred on the Tahiti Property in connection with the various repair and improvement projects, petitioners frequently transferred funds in U.S. currency from their bank in California to a bank account they maintained in Tahiti.  Petitioners have documentation of total funds transferred to their bank account in Tahiti to pay for expenses relating to the Tahiti Property, but the evidence does not show or substantiate the specific use of the funds transferred to petitioners' bank account in Tahiti.

Petitioners allege that from 1984 through 1994 their cumulative cash expenditures relating to purchase and improvements undertaken on the Tahiti Property totaled $1,760,000.

Lear Jet

In 1984, because of anticipated frequent travel, petitioner purchased a Lear jet airplane for $2 million. The Lear jet was used by petitioners for personal travel and to travel to petitioners' timber farm in Oregon, to petitioners' Tahiti Property, to computer symposiums, to machinery auctions, to pick up equipment and parts needed in petitioners' various activities, and to Park City, Utah, where petitioners skied and eventually bought two condominiums and two vacant lots, on one of which petitioners built a large personal residence.

When traveling to the timber farm and to the Tahiti Property, petitioner often would transport in the Lear jet equipment and supplies that would be used at the timber farm and on the Tahiti Property. Occasionally, other family members would travel with petitioners in the Lear jet.

During 1987 through 1989, the first-class air fare between Orange, California, where petitioners' primary residence was located, and North Bend, Oregon, the airport closest to petitioners' timber farm, was approximately $1,600 per person. A commercial airplane trip between these two cities would take

approximately 9 hours and would involve two stops and at least one change of planes.

During the years in issue, petitioner paid a full-time pilot approximately $30,000 a year to fly the Lear jet. Petitioner also was a pilot and served as the second pilot required to fly the Lear jet.

After flying petitioners to Oregon and to the Tahiti Property, and while waiting to fly petitioners back to California or Utah, the pilot, at petitioner's request, would often assist with various projects at the timber farm and at the Tahiti Property.

The Lear jet operating expenses for 1987, 1988, and 1989, including depreciation totaled $667,709, $728,201, and $402,399, respectively.

Petitioner sold the Lear jet in 1994 for $2.45 million.

For purposes of their books and records and their income tax return treatment of expenses of operating the Lear jet, petitioners each year made an allocation of expenses of the Lear jet between what petitioners regarded as business and as personal use. For example, with regard to a trip from Los Angeles to Salt Lake City on February 6, 1989, for the stated purpose "to see condo, conferring with architect, and ski", the total 1.4 hours each way for the Lear jet were allocated by petitioners .7 hour for personal and .7 hour for business, because petitioners viewed

the trip as having a dual purpose (namely, to ski and to meet with a contractor doing work on one of petitioners' condominiums).

Personal Residence

As indicated, during 1987, 1988, and until September 8, 1989, petitioners' principal residence was located at 394 South Esplanade, Orange, California. This residence was an elegant 24-room home on 3.5 lushly landscaped acres. It had a swimming pool, garden patio, servants' quarters, a garage workshop, garden equipment buildings, and parking for up to approximately 40 cars.

Petitioner had rooms in this residence in which petitioner performed paperwork and computer tasks associated with his various activities. In their residence in Orange, California, petitioners also performed bookkeeping, maintained reference manuals and industry publications, and paid numerous bills relating to their many activities.

Petitioners' residence consisted of three levels. In the partial, walkout basement were located two rooms in one of which computers and a copy machine were placed, a bathroom, a furnace room, a small wine room, and a family room.

On the main level were located a study or library in which petitioner occasionally met with others on business matters, the main living room, a large entry, a dining room, three bedrooms, three full baths, and one-half bath.

On the upper level of the residence were 3 rooms in which were located many of petitioners' business, financial, and personal records, additional computers, and a bath. In one of these rooms, Mrs. Kurzet reviewed, paid, and maintained files relating to business and personal bills and activities. In the other two rooms, petitioner maintained an office and a lab with electronic circuit testing equipment related to ALS and his consulting duties.

For 7 years, from 1984 to 1991, petitioner continued to be available to act as a consultant to ALS, and petitioner received a $10,000 per month consulting fee under the contract for the sale of ALS.

Over the course of the 3 years in dispute, petitioner actually performed for ALS consulting services 3 or 4 times a year. Petitioner had no other clients as a consultant.

In connection with his consulting for ALS, petitioner had access to the offices of ALS.

The primary real estate that petitioners owned and rented to tenants consisted of a large industrial warehouse in southern California. Petitioners also owned and rented to tenants two condominiums in Park City, Utah. The evidence is not clear to what extent petitioners used a real estate firm in Park City, Utah, to manage the condominiums.

Petitioners' Books and Records

In 1984 and 1985, petitioner personally developed a computerized bookkeeping system or software program for keeping track of expenses relating to petitioners' various personal, business, and investment activities. Petitioners' bookkeeping system represents a single entry system encompassing the debit side of what is normally encompassed in a double-entry bookkeeping ledger. Petitioners' computerized system is homemade, but it does allow petitioners to track their expenses and to sort and analyze expenses by activity to which the expenses are charged, by job, by payee, and by a number of other criteria.

Petitioners generally retained receipts relating to the majority of their business and personal expenses, and such receipts generally are still available.

As indicated, petitioners' computerized bookkeeping system did not keep track of income. Relatively few transactions produced large amounts of income for petitioners. Mrs. Kurzet kept track of income received by way of separate records and files. Generally, other than income on bank accounts and security transactions, income petitioners received was deposited into petitioners' bank accounts. Copies of the deposit receipts were retained in a file, and at the end of each year all income was entered onto spreadsheets that were given to the accountants who prepared petitioners' income tax returns.

Petitioners' computerized bookkeeping system for their expenses has 153 different account numbers for each of nine different classes of activity.  If an expense was regarded by petitioners as a personal expense, it would be so identified.

Many of petitioners' business and personal expenses were paid for by credit card.  Upon receipt of each monthly credit card bill, petitioners would allocate each charge on the bill between what they regarded as business and personal expenses.  If an expense was to be treated as a business expense, petitioners would identify the particular business activity to which the expense would be allocated.

On their three checking accounts -- one located at a bank in California, one located at a bank in Oregon, and one located at a bank in Tahiti -- petitioners wrote checks to pay bills relating to their business and personal activities.  Mrs. Kurzet would prepare most of the checks to pay both business and personal bills on a computer located in their residence in Orange, California.

Petitioners' Federal Income Tax Returns

Petitioners acknowledge that many errors were made both on their 1987, 1988, and 1989 Federal income tax returns as originally filed and as submitted to respondent as proposed revised returns.  Petitioners attribute many of the errors to the fact that petitioners were not trained accountants, that

petitioners personally developed the bookkeeping system and maintained the books and records relating to their various activities, and they claim that only inadvertently were expenses not properly allocated by petitioners to the proper activity.

For example, on petitioners' original returns for the years in issue, petitioner's Roll Royce and a condominium in Park City, Utah, both of which were personal assets not used in any of petitioners' businesses, were incorrectly allocated to a business activity and depreciation was claimed thereon.

Petitioners' and their accountants' casualness -- in making allocations on both their original and their proposed revised tax returns between petitioners' alleged business, investment, and personal activities -- is illustrated by the allocation of costs associated with an umbrella liability insurance policy relating to petitioners' Orange, California, residence.

Q. [by petitioners' lawyer]  I just handed you another document entitled "Allocation of Umbrella Liability Insurance," which has been entered into evidence as Joint Exhibit 103-CY.  Are you also familiar with this document?

A. [by petitioners' accountant] Yes, I am.

Q.    And did you prepare it?

A.    Yes, I did.

Q.    Would you please describe it to the Court?

A.    This is a document that I prepared entitled "Allocation of Umbrella Liability Deductions Claimed on Revised Returns."  It simply allocates the umbrella liability portion of their insurance which is a component of

other insurance on the home, which is contained in Exhibit 5 -- or account 524 and Exhibit 116 again, and I've allocated it equally to each one of these business activities based on conversations with Mr. Kurzet on -- on his purpose for purchasing that additional insurance.

THE COURT:  This is umbrella liability on -- on their activities or on the home, the Orange County --

THE WITNESS:  It's on -- my understanding, Your Honor, is it's activities that happen at four -- essentially four locations:  the home in Orange County, the timber farm, the investment property in Tahiti, and the industrial building in Orange County, and I simply allocated it equally to each of those.

THE COURT:  Not the home, not the Orange County home?

THE WITNESS:  It does include the Orange County home.

THE COURT:  Where is that on your schedule?

THE WITNESS:  It would be the consulting.

THE COURT:  Consulting you labeled as "home"?  It's in fact the home, and you labeled it consulting?  How do you get the "consulting" label for the home in Orange County?

THE WITNESS:  Because that's where the activity was carried out.

THE COURT:  I'm missing something here.  There were many activities carried on at the home --

THE WITNESS:  Right.

THE COURT:  -- 20 percent of which allegedly is consulting and business related, and 80 percent of which is personal?

THE WITNESS:  Right.

THE COURT:  So where -- where is the personal aspect of the allocation?  Where is the allocation --

THE WITNESS:  We have not --

THE COURT:  -- of the umbrella liability to the personal activities?

THE WITNESS: We have not allocated any to personal here.

THE COURT: Why not?

THE WITNESS: Mr. -- that was based on conversations with Mr. Kurzet that -- that his sole purpose for the additional insurance -- this is liability over and above the homeowners which we have taken personal portion, but for this --

THE COURT: Well, they have three and a half acres of--

THE WITNESS: Right.

THE COURT: -- of country estate. They have a little swimming pool in the back yard, and you don't allocate anything to personal?

THE WITNESS: We didn't.

THE COURT: Why not? Did they use the swimming pool for consulting?

THE WITNESS: No.

THE COURT: What do you think they used the swimming pool for?

THE WITNESS: It's personal.

THE COURT: Did you know there was a swimming pool there?

THE WITNESS: Yes.

THE COURT: And you did not allocate any of the umbrella liability policy to personal?

THE WITNESS: Not on this policy.


Petitioners' original Federal income tax returns for 1985 through 1989, reflect, among other income, the following annual income, before expenses, from consulting, interest on bank and security investments, and rent:

| Year | Consulting | Interest | Rent | Total |
|------|------------|----------|------|-------|
| 1985 | $120,000 | $933,054 | $304,845 | $1,357,899 |
| 1986 | 120,000 | 599,692 | 242,500 | 962,192 |
| 1987 | 120,000 | 681,950 | 312,154 | 1,114,104 |
| 1988 | 120,000 | 694,879 | 258,817 | 1,073,696 |
| 1989 | 120,000 | 652,926 | 295,411 | 1,068,337 |

On their books and records and tax returns, petitioners regarded the timber farm as qualifying as a trade or business, and petitioners generally treated current expenses incurred on the timber farm as ordinary and necessary expenses of a trade or business.

The employees on the timber farm maintained a log of expenses they incurred, and receipts were maintained with an indication of the equipment and activity to which the expenses related.

Petitioners capitalized many of the costs relating to capital assets located on or constructed on the timber farm. For example, the water reservoir was treated as a self-constructed capital asset, and costs that petitioners allocated thereto were not expensed but were charged to a capital construction account for the reservoir. On petitioners' original Federal income tax returns for 1987, 1988, and 1989, a total of approximately $70,000 was capitalized as part of the capitalized costs of the reservoir and pond.

On petitioners' proposed revised Federal income tax returns for 1987, 1988, and 1989, a total of $174,000 in costs is

capitalized as reservoir and pond related costs.  Petitioners'
revised capital costs of the reservoir and pond are based, in
part, on the allocation to the capital costs of the reservoir of
a portion of the direct labor costs and of the indirect or
general expenses incurred each year on the timber farm and on
petitioners' estimate that 40 percent of total direct labor costs
incurred on the timber farm related to the reservoir and should
therefore be capitalized as part of the costs thereof.  Also, in
allocating general overhead costs of the timber farm to the
capital costs of the water reservoir and pond, petitioners
applied the above 40-percent direct-labor ratio.  Further, on the
proposed revised returns, petitioners allocated to the capital
costs of the reservoir 100 percent of the depreciation on the
reservoir-unique equipment but no portion of the depreciation on
the nonreservoir-unique equipment.

In allocating general overhead costs of the timber farm to
the capital costs of the water reservoir and pond and in applying
the above 40-percent ratio (based on petitioners' computation of
the ratio of direct labor costs of the reservoir to total direct
labor costs incurred on the timber farm), neither petitioner's
time and labor nor two other individuals' time or labor, while
working on the reservoir and pond were factored into the direct-
labor percentage.  Petitioners did not factor into the direct-
labor percentage petitioner's personal labor on the reservoir
because no hard dollar cost was incurred therefor (i.e.,

petitioner's labor was contributed, and no wage or fee was paid to petitioner for his labor on the timber farm).

Petitioners' total $147,643 cost for purchase and improvement of the mobile unit was capitalized, and depreciation thereon was claimed by petitioners as an expense of the timber farm.

The primary difference between petitioners' original Federal income tax returns and petitioners' proposed revised Federal income tax returns, all of which were prepared by accountants and experienced tax return preparers, relates to the Lear jet. On petitioners' original Federal income tax returns, the Lear jet was treated as a separate trade or business activity, and all noncapital costs thereof were treated as current business expenses, including depreciation. On the proposed revised returns, the Lear jet is not treated as a separate business activity. Rather, based on the Lear jet's flight logs, the noncapital costs of the Lear jet (including depreciation) are allocated to the various separate other activities of petitioners and treated as deductible section 162 business expenses, deductible section 212 expenses, or as nondeductible personal expenses depending on the business, investment, or personal nature of the underlying activity to which the expenses are allocated.

On petitioners' proposed revised Federal income tax returns, petitioners treat their Tahiti Property as a for-profit

investment activity and the expenses thereof as deductible under section 212 only from adjusted gross income and subject to the 2-percent floor on miscellaneous itemized deductions under section 67.

Petitioners' proposed revised Federal income tax returns continue to treat petitioners as engaged in a number of separate trades or businesses, specifically a timber farm business, a consulting business, and computer and real estate rental businesses.

On petitioners' original Federal income tax returns for the years in issue, petitioners claimed $897,685 in total net losses relating to the timber farm. On petitioners' Federal income tax returns for the years 1985 through 1992, petitioners claimed $2,114,325 in total net losses relating to the timber farm.

By the end of 1993, on petitioners' proposed revised Federal income tax returns for 1985 through 1993, petitioners claimed $3,051,225 in total net losses relating to the timber farm.

On the line on each of their original Federal income tax returns for each year in issue, to indicate whether they maintained a home office, petitioners indicated "No". However, on the Schedules C of their original Federal income tax returns for 1987, 1988, and 1989, relating to their various alleged business activities (namely, the timber farm, the Tahiti Property, the consulting business, and the computer and real estate rental businesses), petitioners claimed expenses relating

to five rooms or one-fifth of all expenses of the Orange County residence as deductible home office business expenses.

Respondent's Audit

On audit, respondent did not dispute that petitioner's consulting and his computer and real estate rental activities constituted trade or business activities. Respondent, however, disallowed numerous expenses claimed on petitioners' original Federal income tax returns on the grounds, among others, that petitioners had not substantiated many of the claimed expenses and that the timber farm, Tahiti Property, and Lear jet activities in which petitioners were engaged did not constitute trade or business activities under section 162, nor for-profit investment activities under section 212.

With exception of expenses claimed relating to the Tahiti Property, respondent now stipulates that essentially all of petitioners' claimed expenses have been substantiated as to amount and payment, but not necessarily as to character.

The primary remaining adjustments will be addressed in the following sequence: (1) Whether petitioners' timber farm constituted a for-profit trade or business activity under section 162 and whether petitioners' Tahiti Property constituted a for-profit investment activity under section 212; (2) whether the percentage of timber farm general expenses that should be capitalized as part of the capital costs of the water reservoir

and pond should take into account the hours that petitioner and other individuals worked on the reservoir and pond and whether some portion of costs relating to the nonreservoir-unique equipment should be allocated to the reservoir and pond and therefore capitalized; (3) whether petitioner's use of the Lear jet for petitioner's business- and investment-related travel was excessive and unreasonable and therefore whether the expenses of the Lear jet are deductible under sections 162 or 212; and (4) whether any portion of petitioners' residence in Orange, California, qualifies as a home office under section 280A and whether expenses relating thereto are deductible.

A number of other issues are also addressed, but various adjustments that are still in dispute we do not address at this time.  We believe that the parties should be able to settle the remaining issues.

OPINION

Timber Farm and Tahiti Property

To be treated as a trade or business under section 162 or as a for-profit activity under section 212, taxpayers must be engaged in the activity in question with the good faith objective and actual purpose of making a profit.  Jackson v. Commissioner, 864 F.2d 1521, 1525 (10th Cir. 1989), affg. 86 T.C. 492 (1986); Dreicer v. Commissioner, 78 T.C. 642, 643-644 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

The issue is one of fact and is to be resolved not on the basis of any one factor, but on the basis of all of the facts and surrounding circumstances.  Allen v. Commissioner, 72 T.C. 28, 34 (1979); sec. 1.183-2(b), Income Tax Regs.  Petitioners bear the burden of proving that their timber farm and their Tahiti Property, during the years in issue, constituted the actual, good faith conduct of a trade or business or of an activity entered into for profit.  Rule 142(a).

Section 1.183-2(b), Income Tax Regs., provides a list of nine nonexclusive factors that are to be analyzed in determining whether an activity was conducted with an actual and honest objective of making a profit, as follows:  (1) The manner in which the taxpayer carried on the activity; (2) the taxpayer's expertise; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity would appreciate in value; (5) the success of the taxpayer in carrying on the activity; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of profits, if any, which are realized in the activity; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.  More weight is to be given to objective factors than to a taxpayer's mere statement of intent.  Beck v. Commissioner, 85 T.C. 557, 570 (1985).  Further, the absence of one particular

factor may be more significant than the superficial presence of other factors.  Id.

Citing Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated on other grounds 382 U.S. 68 (1965), respondent argues that even if, in later years, the timber farm constituted a trade or business or for-profit activity, because of petitioners' failure to cut and sell any of the timber during the years in issue, petitioners' activity with regard to the timber farm should be regarded only as startup activity, not activity of an existing trade or business or for-profit activity.  Respondent's argument seems to be based on the assertion that to be treated as a current for-profit activity, the timber farm must have generated current income during the years before us.

We disagree with respondent's arguments as to the timber farm.  In each year, the trees on petitioners' timber farm were increasing in size, width, volume, and, generally, in value depending on market prices for cut timber.

As the U.S. Dept. of Agriculture's Forest Owners' Guide To Timber Investments, The Federal Income Tax, and Tax Recordkeeping, No. 681 (1989), explains with regard to timber growing activity, a timber farm activity may be regarded as a current for-profit activity --

> even if the property is currently producing no income --
> provided that the timber growing activity is being engaged

in for profit and the expenditures are directly related to the income potential of the property.  [Id. at 19-20.]

Respondent's argument fails to appreciate that in a very real sense petitioners' timber farm, in every year, was maintained for the purpose of generating income through the growth and increase in value of the trees.  Respondent's argument also fails to appreciate that in the timber business, individual trees typically are harvested only once every 50 to 60 years.  Respondent's argument, carried to the extreme, would treat taxpayers in the timber business as engaged in that business, for Federal income tax purposes, only in the particular year they actually harvest trees.

The evidence in this case indicates and supports our conclusion that petitioners invested in their timber farm with an actual and good faith profit objective and that petitioners' operation and management of the timber farm constituted a legitimate business activity.

This case is not dissimilar from Allen v. Commissioner, supra, and Hoyle v. Commissioner, T.C. Memo. 1994-592, in which the taxpayers' financial resources, among other things, explained the taxpayers' ability, over a number of years, to absorb large expenses and losses until appreciation in the value of the property is realized.  The explanation provided in Allen v. Commissioner, supra at 36, is particularly apropos:

Although the petitioners have sustained substantial current losses, they still hope, in the long run, to realize a profit because the fair market value of the lodge has appreciated * * *.  The appreciation in value may, or may not in fact, offset the aggregate operating losses, but the prospect of realizing a profit on the sale of the lodge was bona fide when * * * [the taxpayers] decided to invest in the lodge and is sufficient to explain * * * [their] willingness to continue to sustain operating losses.  Sec. 1.183-2(b)(4), Income Tax Regs.  Moreover, the out-of-pocket expenses graphically demonstrate that part of the losses were economic losses and not merely tax losses.

Most importantly, the * * * [taxpayers] have established that they never used the lodge for their own personal enjoyment.  Only in connection with the management of the lodge did the * * * [taxpayers] stay in it overnight.  At all times, the lodge was either rented, available for rent, or being prepared to be rented.  Thus, it offered them no recreational benefits.

See also St. Germain v. Commissioner, T.C. Memo. 1959-73, involving the for-profit operation of a timber farm.

On brief, respondent appears to concede that upon purchase of the timber farm in the spring of 1985, petitioners had the objective of owning and operating the timber farm for profit and as a business.  Respondent, however, goes on to argue that petitioners "abandoned these plans" during 1985 because of falling timber prices.  We disagree.  Nothing suggests that petitioners ever abandoned their profit objective with regard to the timber farm.  In 1986, 1987, and 1988, because of an unexpected decline in timber prices, petitioners simply deferred cutting and selling the timber.

Respondent also argues that the startup nature of petitioners' timber farm, during the years before us, is

established by petitioners' construction of a water reservoir on the property in preparation to enter into the livestock business. We disagree. The water reservoir related at least equally to the fire risk to which existing trees on the timber farm were exposed.

Not a single recreational or personal objective for petitioners' large cash investment in and extensive work and activity on the timber farm has been suggested, and on brief respondent concedes "there appear to be no elements of recreation, in the traditional sense," involved in petitioners' timber farm. Not one of the factual witnesses respondent called supported respondent's position that petitioners carried on the timber farm as anything other than a good faith for-profit business activity.

With regard further to specific factors typically analyzed under section 183, we conclude as follows.

(1) Manner of conducting activity: Petitioners carried on the timber farm activity in a businesslike manner. They worked hard and long hours on the timber farm. They hired competent people to manage and secure the property on a day-to-day basis. They made necessary and significant improvements to the timber farm. They did not use the timber farm for personal entertainment, recreation, or retirement. They were creative and innovative in attempting to improve the timber farm and

eventually to realize substantial overall net profits therefrom at the time the trees are cut and sold. Petitioners' bookkeeping was amateurish but extensive.

(2) Expertise: Petitioners were innovative, attentive, informed, hardworking, capable, and no-nonsense owners and managers of the timber farm. They hired experienced employees, and, where necessary, they hired experts to advise them on aspects of the timber farm.

(3) Time and effort: Petitioner worked extremely long hours and put a great deal of effort in maintaining and improving the timber farm, and he expected the same of his employees.

(4) Appreciation in value of assets: Petitioners' good-faith intent and expectation that the timber on the timber farm would appreciate in value are clear and have been proven accurate.

(5) Success in other activities: Petitioner's success as a businessman in a number of activities is unquestioned.

(6) and (7) Income or losses realized: Profits and appreciation that appear to be available from petitioners' timber farm have not yet been realized or cashed in. But they are there, ready to "harvest", in amounts significantly in excess of petitioners' costs.

Respondent argues that under a proper calculation of the costs that petitioners incurred on their timber farm,

petitioners' actually incurred losses from their timber farm far in excess of appreciation that occurred in the value of the timber. We disagree. Respondent's calculations are flawed and ignore the credible evidence as to the value of the timber and other improvements to and assets located on the timber farm.

(8) <u>Financial status of taxpayers</u>: Petitioners are wealthy and, during the years in issue, could well afford to wait to realize expected profits from their timber farm until the prices for cut timber and the market make it appropriate to maximize those profits.

(9) <u>Personal pleasure or recreation</u>: None.

In summary, the evidence indicates that petitioners in 1985 purchased an existing, mature timber farm, that petitioners immediately and in each year undertook substantial activity, and incurred substantial expenses, to protect and enhance their timber farm business, that petitioners' activity in connection with the timber farm constituted an existing for-profit trade or business, and that petitioners' use of the timber farm did not constitute a hobby, personal recreation, nor a personal, nonbusiness activity.

At the time of purchase in 1985 and during each of the years in issue (namely, 1987 through 1989), petitioners intended to, and did, hold and manage the timber farm as a for-profit business activity. Petitioners' ownership and operation of the

timber farm constituted a for-profit, business activity with respect to which the ordinary and necessary expenses are deductible under section 162.

Capital Costs of Water Reservoir and Pond

Respondent argues that, using a direct-labor percentage, the percentage of timber farm general expenses that should be capitalized as part of the capital costs of the water reservoir and pond on the timber farm should take into account the hours that petitioner and his two employees worked on the reservoir and pond and that some portion of the costs relating to the nonreservoir-unique equipment should be allocated to the reservoir and pond and therefore capitalized.

We agree with respondent as to the need to include in the direct-labor percentage (used to allocate general expenses of the timber farm to the capital costs of the water reservoir and pond) a factor for petitioner's and his two employees' labor on the reservoir.

With regard to the direct costs of the nonreservoir-unique equipment, we do not believe an allocation to the capital costs of the water reservoir and pond is appropriate. The evidence is not compelling that any nonreservoir-unique equipment was used extensively on the water reservoir or pond. We do not sustain this adjustment.

Tahiti Property

With regard to petitioners' Tahiti Property, our conclusions are just the opposite. Petitioners' Tahiti Property has inherently associated with it extensive recreational and personal aspects. Petitioners have not satisfied their burden of proof that the Tahiti Property was held and managed by them for anything other than personal reasons. Rule 142(a).

Petitioners did not maintain complete and adequate records with regard to expenditures made on the Tahiti Property. Petitioners' assertion as to significant appreciation in the value of the Tahiti Property is neither credible nor persuasive. Petitioners claim that, as a result of their efforts and improvements, by 1994, the fair market value of the Tahiti Property increased to $3.7 million and that, after their purchase costs of $989,000 and additional costs of $597,000, for total alleged cash expenditures of $1,760,000, petitioners have realized on paper an economic gain of $1,940,000 in connection with the Tahiti Property.

No credible evidence supports either the amount or nature of the claimed total expenses petitioners incurred on the Tahiti Property, nor the fair market value of the Tahiti Property.

We conclude that, during the years in issue, petitioners' ownership and management of the Tahiti Property constituted a personal activity with respect to which petitioners' expenses

are not deductible under either section 162 or 212.  See sec. 262.

Lear Jet

Petitioners have not satisfied their burden of proving that the large expenses of operating the Lear jet qualify as ordinary and necessary business expenses of petitioners' timber farm, of petitioner's consulting business, or of petitioner's computer and real estate rental businesses.  The expenses of purchasing, maintaining, and operating a personal Lear jet to make a few trips each year to Oregon and to Utah appear extraordinary.  On the facts of this case, such expenses do not constitute ordinary and necessary expenses of any of petitioners' business activities.

Further, because the Tahiti Property does not qualify as a business or for-profit activity, petitioners' transportation to Tahiti in the Lear jet does not qualify as anything other than personal travel.  The large transportation expenses (including significant noncash expenses such as depreciation) associated with the Lear jet appear to be out of the ordinary and to be unnecessary particularly in light of the fact that petitioners' timber farm was not producing any current income (due to petitioner's decision to defer cutting any of the timber) and to the fact that the Tahiti Property, as we have held, did not constitute a for-profit activity.  See Commissioner v. Heininger, 320 U.S. 467, 469 (1943), as to the factual nature of this issue.

The inconvenience that petitioners would have experienced a few times a year in flying to the Oregon timber farm via commercial air carrier we regard as minimal, as ordinary, and as common, both for individuals and for businessmen.  That petitioners -- as an ordinary and necessary business expense under the facts of this case -- would incur the extravagant costs of purchasing and maintaining a Lear jet to avoid such infrequent and slight inconvenience has not been established. See Harbor Med. Corp. v. Commissioner, T.C. Memo. 1979-291, affd. without published opinion 676 F.2d 710 (9th Cir. 1982); Bullock's Dept. Store, Inc. v. Commissioner, T.C. Memo. 1973-249; Hatt v. Commissioner, T.C. Memo. 1969-229, affd. 457 F.2d 499 (7th Cir. 1972); cf. Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388 (9th Cir. 1977), revg. in part and remanding T.C. Memo. 1973-223; Noyce v. Commissioner, 97 T.C. 670, 688 (1991).

We conclude that petitioners, for the years before us, should be allowed (with respect to each of the trips from Orange, California, at which was located petitioner's consulting and computer and real estate rental businesses, to their Oregon timber farm) a business travel expense deduction under section 162 for the estimated or constructive travel expenses that petitioners would have incurred based on first class air fare.

With regard to the constructive expenses of transporting equipment and machinery that petitioners apparently transported

with them to Oregon in their Lear jet, petitioners have provided no basis on which we can estimate what such transportation expenses would have been. The evidence does not specifically itemize or adequately describe any of the equipment or machinery so transported, its weight, or size. On the evidence before us, we are unable to estimate constructive transportation expenses of equipment and machinery to petitioners' Oregon timber farm.

In summary, the use of a private Lear jet by petitioners in connection with their Tahiti Property we regard as personal. Even for a businessman as successful, busy, and wealthy as petitioner, on the facts of this case, we regard petitioners' use of a Lear jet in connection with travel to their timber farm in Oregon as extravagant and not ordinary and necessary.

Because of the substantial personal aspect of petitioners' travel to Utah (namely, to ski and to purchase and build a personal residence), we decline to make any attempt to estimate what portion of petitioners' claimed travel expenses to Utah might arguably be deductible as relating to the two rental condominiums that petitioners owned in Park City, Utah. The use of the Lear jet in connection with petitioners' travel to Utah we regard either as personal (and relating to petitioners' skiing and personal residence that was being constructed in Park City, Utah), or as extravagant and as not qualifying as ordinary and necessary expenses of the two condominium rental units that petitioners owned in Utah.

Personal Residence

Petitioners claim that one-fifth of all expenses of their residence in Orange, California, qualify under section 280A as deductible home office expenses relating to petitioner's various business and investment activities. Petitioners claim that five rooms or one-fifth of the residence was used exclusively for business. Respondent claims that none of the residence qualifies as a home office and that none of the expenses of the residence qualify as deductible home office expenses. We agree with respondent.

The evidence does not establish that any portion of petitioners' residence satisfies the threshold requirements of section 280A(c)(1); namely, that the alleged home office qualifies either as "the principal place of business" for at least one business of the taxpayer, as a place in which the taxpayer meets with clients in the normal course of at least one of his business activities, or as a structure separate from the residence.

The evidence is clear that petitioners' alleged home office does not qualify as a place in which petitioners regularly met with clients, nor as a structure separate from their residence. With regard to whether petitioners' alleged home office qualifies as "the principal place of business" for any of petitioner's businesses, the evidence is conspicuously thin.

The principal place of petitioner's timber farm, which we have found constituted a trade or business, obviously was located in Oregon.  The principal place of petitioners' consulting business would appear to be at the nearby southern California offices of ALS, petitioner's former corporation and his only client in his consulting business.

The evidence in the record does not enable us to find that the principal place of petitioner's computer and real estate rental businesses was located in a portion of petitioners' residence.

We acknowledge petitioners' extensive business and investment activities.  The evidence in this case, however, on this issue on which petitioners have the burden of proof does not provide us with adequate information to make an affirmative finding that petitioners' residence constituted the primary place of petitioner's consulting or computer and real estate rental businesses.  Commissioner v. Soliman, 506 U.S. 168, 176-179 (1993).

We emphasize that, under section 280A, the absence outside the taxpayer's residence of any suitable office or place in which the taxpayer may manage investments is not adequate. Managing investments in one's personal residence does not qualify the residence, or any portion thereof, as a home office. An existing trade or business must be domiciled in the residence.

- 51 -

For the reasons stated, we conclude that no portion of the expenses of petitioners' residence in Orange, California, qualifies as deductible expenses of a home office.

Respondent also claims that the mobile unit installed on the timber farm constituted a personal residence of petitioners and that for any of the expense of the mobile unit to qualify for business expense deductions, the mobile unit or some portion thereof must satisfy the requirements of section 280A. We disagree.

During the years in issue, the mobile unit was not used as a personal residence of petitioners. Petitioners' time on the timber farm represented all work. No portion thereof is to be regarded as personal, and the mobile unit is not to be regarded as a personal residence. See Allen v. Commissioner, 72 T.C. 28, 32 (1979).

Each of petitioners' trips to and all of petitioners' time spent on the timber farm related to the work and business of the timber farm. Until September of 1989, petitioners lived in their large personal residence in Orange, California, and thereafter in their large personal residence in Park City, Utah. The mobile unit located on the timber farm is not properly regarded as a personal residence. Petitioners' use of the mobile unit was work related and is not to be regarded as personal.

All of the expenses of the mobile unit are to be treated either as ordinary or as capital expenses of petitioners' timber farm.

Additions To Tax

For 1987 and 1988, respondent asserts against petitioners the negligence and substantial understatement additions to tax under sections 6653(a) and 6661, respectively. For 1989, respondent asserts against petitioners the accuracy-related penalty under section 6662(a).

Respondent emphasizes petitioners' burden of proof as to the above additions to tax and penalty, and as evidence of petitioners' negligence, respondent points to many errors on petitioners' Federal income tax returns.

We do not believe, however, that the additions to tax and penalty asserted by respondent against petitioners in this case are appropriate. Many of the errors on petitioners' tax returns are attributable to the amateurish books and records that petitioners unfortunately established to keep track of their many business, investment, and personal activities. In our opinion, the origin and maintenance of these books and records are traced to petitioner's overconfidence that he is a man of many talents -- even bookkeeping and accounting.

Despite his zeal to do everything himself, petitioner hired an accounting firm to prepare petitioners' income tax returns.

Having been hired, however, petitioners' accounting firm and tax return preparers surely bear some significant portion of the fault for the fact that many of petitioners' bookkeeping errors were perpetuated on petitioners' tax returns. Many questions that should have been asked by the accountants before preparing and signing petitioners' tax returns apparently were not asked. A taxpayer's strong personality is no excuse for the failure of independent tax return preparers to exercise diligence and to ask questions of their clients that are necessary and that should be obvious to qualified tax professionals in the preparation of tax returns.

Petitioner's reliance on professional tax return preparers in the preparation and filing of their Federal income tax returns for the years in issue constitutes a significant basis for our conclusion that the additions to tax and penalty should not be sustained in this case. United States v. Boyle, 469 U.S. 241, 251 (1989); Chamberlain v. Commissioner, 66 F.3d 729, 732-733 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228; Freytag v. Commissioner, 89 T.C. 849, 888-889 (1987), affd. 904 F.2d 1011, 1017 (5th Cir. 1990), affd. on another issue 501 U.S. 868 (1991); Guenther v. Commissioner, T.C. Memo. 1995-280; Clark v. Commissioner, T.C. Memo. 1994-278; Beshear v. Commissioner, T.C. Memo. 1990-544.

We believe that the many errors that occurred on petitioners' original and proposed revised Federal income tax

returns are reasonably explained by the factually oriented nature of each of the issues in this case, by the factually complicated nature of the many business, investment, and personal activities in which petitioners were involved, by the consuming manner in which petitioners undertook each of the activities in which they became involved, by the nature and volume of the many categories of expenses incurred by petitioners each year, by the nature of the books and records which petitioners innocently but amateurishly developed and used, by the failure of petitioners' accountants and tax return preparers to prepare diligently the returns in question, and by the unfortunate relationship that developed between petitioners' and respondent's representatives throughout the course of this dispute.

No one of the above factors is determinative. But we believe that, on the unique facts and circumstances of this case, imposition of any of the asserted additions to tax would be inappropriate. We so hold.

<u>Decision will be</u>

<u>entered under Rule 155</u>.