T.C. Memo. 2016-104

UNITED STATES TAX COURT

RICHARD STEINBERGER AND C. MARIA RIVA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2050-12.                           Filed May 25, 2016.

<u>James S. MacBeth</u>, for petitioners.

<u>William F. Castor</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Respondent determined deficiencies of $67,393, $48,902, and $16,346 in, and accuracy-related penalties of $13,478.60, $9,780.40, and $3,269.20 in relation to, petitioners' 2007, 2008, and 2009 Federal income tax, respectively.  The issues for decision are whether:  (1) petitioners' elections to group certain activities with their airplane activity as a single activity for section

[*2] 183 purposes were valid elections for the years in issue;[1] (2) the airplane activity on its own was entered into for profit for 2008 and 2009; and (3) petitioners are liable for accuracy-related penalties for the years in issue.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and facts drawn from stipulated exhibits are incorporated herein by this reference. Petitioners resided in Kansas when they timely filed their petition.

I.    Petitioners' Medical Activities

Dr. Steinberger has practiced medicine since 1989, specializing in urology. He practiced as an employee and shareholder of Wichita Urology Group, P.A. (WUG), from its formation in 2001 and continued to do so during the years in

---

[1]The Federal income tax returns of Air Urology Investments, LLC (AUI), the entity that operated the airplane and was taxed as a partnership, were not examined for the years in issue. Respondent disallowed the flow through losses petitioners reported on the Schedules E, Supplemental Income and Loss, attached to their Forms 1040, U.S. Individual Income Tax Return, for the years in issue because he determined that the airplane activity was not entered into for profit. When discussing the airplane activity infra the Court will refer to the activity as either AUI's or petitioners' airplane activity. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent also made adjustments to petitioners' 2008 alternative minimum tax and their 2009 minimum tax credit. Those adjustments are computational and will not be discussed further.

**[*3]** issue. He and six other doctors each owned an equal one-seventh interest in WUG during the years in issue. At no time from its formation until the time of trial did Dr. Steinberger serve as WUG's president. His wife, Dr. Riva, specialized in pediatric pulmonology as an employee of the University of Kansas School of Medicine during the years in issue.[3]

WUG, after deducting certain common or shared expenses such as utilities, office overhead, and rent from its gross receipts, allocated its net receipts to its shareholders in two shares--a pro rata share and a production share. WUG allocated one-third of its net receipts equally to its shareholders as the pro rata share. It allocated the remaining two-thirds of its net receipts to its shareholders on the basis of their respective percentages of production--receipts from services provided by an individual shareholder divided by the total receipts from services provided by all shareholders--as the production share. Each shareholder's gross pay comprised his or her pro rata and production shares. WUG then deducted certain individual or personal expenses--such as malpractice insurance premiums, retirement plan contributions, and travel expenses--from each shareholder's gross pay.

---

[3]Dr. Riva did not participate in and was not present at the proceedings. She and Dr. Steinberger filed joint Federal income tax returns for the years in issue, and she will be bound by the Court's decision.

[*4]   All of the income WUG allocated to Dr. Steinberger for the years in issue was reported on Forms W-2, Wage and Tax Statement.  For the years in issue, Dr. Steinberger also held ownership interests in Kansas Surgery & Recovery, LP, an outpatient surgery center; Via Christie Cyberknife, LLC, a radiosurgery center; and South Kansas Lithotripsy.[4]

II.   Petitioners' Farming Activity

Petitioners also equally owned Pegasus Meadows, LLC, which was organized in 2001.  In 2008 they used personal funds to purchase farmland in Iowa, which was held by Pegasus Meadows.  Petitioners contracted with Farmers National Co. to supply a local farm manager to oversee the day-to-day operations of the farm.

III.   Petitioners' Airplane Activity

For as long as Dr. Steinberger has been licensed to practice medicine, he has also been a licensed pilot and was so in the years in issue.  In 2005 petitioners sought advice from Advocate Aircraft Taxation Co.[5] (Advocate) about the purchase and operation of an airplane.  Dr. Steinberger sought Advocate's services

---

[4]South Kansas Lithotripsy is identified as both an LLC and an LLP in the stipulation of facts.

[5]Sometime in 2007 Advocate Aircraft Taxation Co. became Advocate Legal Consulting Group.  "Advocate" will be used to refer to both entities.

[*5] after doing Internet research and upon advice from the airplane dealer from whom a Cirrus SR 22 airplane (airplane) was purchased. In January 2006, in furtherance of that goal, Advocate formed two limited liability companies--Air Urology, LLC (AU), and AUI. AUI was taxed as a partnership. Dr. Steinberger had a 75% membership interest and Dr. Riva a 25% membership interest in AUI. AU was taxed as a disregarded entity. AUI was the sole member of and wholly owned AU. In February 2006 AU purchased the airplane. The airplane had a single engine and four seats, including crew seating. After AU purchased the airplane, Dr. Steinberger began flying it for both personal and work-related travel. He was the only person who flew the airplane during the years in issue.

### A.   Airplane Leases

#### 1.   Lease Between AU and Dr. Steinberger Personally

AU, as owner, and Dr. Steinberger, as operator, entered into an aircraft rental agreement some time in 2006.[6] The pertinent provisions of the agreement are explained infra.

The agreement states that Dr. Steinberger's purpose for renting the airplane is "transporting Operator or its guests on a noncommercial basis." The agreement

---

[6]The blanks to fill in the dates on the first page of the agreement are empty and "2006" is typeset on the agreement. The document is not otherwise dated.

**[\*6]** is an hourly rental agreement of "$168 per flight hour, less direct cost for any fuel purchased". The rental period consists of flight time during the term of the agreement. The owner will bear all maintenance and fuel costs during each rental period and keep the airplane insured. Under the agreement the operator "assumes and shall bear the entire risk of loss, theft, confiscation, damage to or destruction of the Aircraft from any cause whatsoever". Dr. Steinberger signed the agreement as the chairman of AU and for himself personally.

### 2. Lease Between AU and AUI

AU, as owner, and AUI, as operator, entered into a more detailed aircraft hourly rental agreement in 2006.[7] The pertinent provisions of the agreement are explained infra.

The agreement states that AUI's purpose for renting the airplane is "transporting Operator or its members, directors, officers, employees and guests in furtherance of its primary, non-transportation business and its employee benefits." The agreement is an hourly rental agreement for $80 per flight hour with an initial rental payment of $2,000 due on March 15, 2006. Under the agreement the

---

[7]Similar to Dr. Steinberger's personal aircraft rental agreement, the blanks to fill in the dates on the first page of the agreement are empty, and "2006" is typeset on the agreement. The delivery and acceptance certificate attached to the agreement is dated "2/23/06".

[*7] operator is responsible, at its own cost and expense, for the airplane's maintenance. The operator also "assumes and shall bear the entire risk of loss, theft, confiscation, damage to or destruction of the Aircraft from any cause whatsoever". The operator will also insure the airplane and pay to or indemnify the owner for all "franchise, gross receipts, rental, sales, use, excise, personal property, ad valorem, value added, leasing, leasing use, stamp, landing airport use or other taxes, levies, imposts, duties, charges, fees or withholdings of any nature". The agreement includes an indemnification clause whereby the operator indemnifies the owner "from and against any and all losses, claims * * * suits, demands, costs, and expenses of every nature * * * arising directly or indirectly from or in connection with the possession, maintenance, condition, storage, use, operation, or return operation of the Aircraft". Dr. Steinberger signed the agreement as both AU's and AUI's chairman.

**[\*8]**         3.      Lease Between AU and WUG

AU, as owner, and WUG, as operator, entered into an aircraft hourly rental agreement in June 2006.[8]  The pertinent provisions of the agreement are explained infra.

The agreement states that WUG's purpose for renting the airplane is "transporting Operator or its members, directors, officers, employees and guests in furtherance of its primary, non-transportation business use."  The agreement is an hourly rental agreement for $170 per flight hour[9] with a stipulated loss value of $400,000.  The agreement requires that either Dr. Steinberger or another duly licensed pilot agreed upon by the parties shall operate the airplane.

Under the agreement the owner is responsible for maintaining and insuring the airplane.  The operator "assumes and shall bear the entire risk of loss, theft, confiscation, damage to or destruction of the Aircraft from any cause whatsoever".  There is no indemnification clause in the agreement, but petitioners personally

---

[8]This agreement, like the other two agreements AU entered into, have no dates on the first page save "2006" typeset on the agreement and no dates next to the parties' signatures.  The action of directors by written consent in lieu of meeting attached to the agreement is dated June 29, 2006.

[9]The parties stipulated that WUG paid rent of $225 per flight hour for the years in issue.  There is no evidence in the record that WUG ever agreed to pay rent of more than $170 per flight hour as agreed to in the 2006 aircraft hourly rental agreement entered into by AU and WUG.

[*9] signed indemnification and release forms dated June 29, 2006, indemnifying WUG and releasing all claims against it attributable to Dr. Steinberger's operation of the airplane. The agreement is signed by Dr. Steinberger for AU, and by WUG's president.

Attached to the agreement is a WUG document entitled "Action of Directors by Written Consent in Lieu of Meeting" approving the agreement and authorizing WUG's president to enter into the agreement on WUG's behalf. The document is signed by five of WUG's six directors, one of whom was Dr. Steinberger.

### B. Operation of the Airplane

Dr. Steinberger recorded his flights for the years in issue on flight logs Advocate provided him. The operator listed for each flight was either AUI or WUG--Dr. Steinberger personally is not listed as the operator for any of the flights for the years in issue. AUI is listed as the operator for all training and maintenance flights and for any personal flights Dr. Steinberger made during the years in issue.

### 1. Flight Hours for the Years in Issue

In 2007 Dr. Steinberger recorded a total of 98.3 flight hours. AUI is identified as the operator for 34.2 of those flight hours, which included 23.3 hours of training and maintenance, and WUG is identified as the operator for 64.1 of

[*10] those hours.[10] The flight log shows that Dr. Steinberger flew his daughter to a "club meeting" on February 17, 2007, and returned with her on February 18, 2007. AUI is identified as the operator for that flight, but the log's "use" column for that flight is labeled "PNE" for personal nonentertainment. The flight log also shows that Dr. Steinberger picked up his son from college and then took him back the weekend of September 1, 2007. AUI is also identified as the operator for that flight, and the log's use column for that flight is also labeled PNE.

In 2008 Dr. Steinberger recorded a total of 97.1 flight hours. AUI is identified as the operator for 54 of those flight hours, which included 36.2 hours of training and maintenance, and WUG is identified as the operator for 43.1 of those flight hours.[11] Two of AUI's flights in 2008 were to Iowa--the first to purchase the farmland in April and the second in September.[12]

---

[10]The parties stipulated that AUI paid rent to AU for 29.3 flight hours, which included 20.9 hours for training and maintenance, and WUG paid rent to AU for 65.6 flight hours for 2007. The flight log for 2007 entered into evidence does not support the parties' stipulated flight hours.

[11]The parties stipulated that AUI paid rent to AU for 58.5 flight hours, which included 41.2 hours of training and maintenance, and WUG paid rent to AU for 41.8 flight hours for 2008. The flight log for 2008 entered into evidence does not support the parties' stipulated flight hours.

[12]The parties stipulated that Dr. Steinberger flew to Iowa to inspect the farm two to three times a year. The flight logs for 2008 and 2009 do not support that

(continued...)

**[*11]**    In 2009 Dr. Steinberger recorded a total of 89.6 flight hours through October 31, 2009.  There is no flight log for November and December 2009 in the record.  AUI is identified as the operator for 29 of those flight hours, which included 16.3 hours of training and maintenance, and WUG is identified as the operator for 60.6 of those flight hours.[13]  There was only one completed flight to the farmland in Iowa in 2009.  See supra note 12.  Dr. Steinberger again flew to pick his son up from and return him to college.  AUI is identified as the operator for that flight, and the log's use column is labeled PNE.

　　　　2.　　WUG Flights

Although based in Wichita, WUG's doctors traveled to cities throughout Kansas to provide services to patients at rural clinics, with some doctors traveling as far as Dodge City and Liberal, Kansas, which are 155 and 212 miles and take approximately three and four hours to travel to by automobile from Wichita, respectively.  The doctors' personal preferences dictated their modes of

---

[12](...continued)
stipulation.  The only other flights to Iowa listed in the flight logs are an August 16, 2009, flight and an October 31, 2009, flight that was aborted because of weather.

　　[13]The parties stipulated that AUI paid rent to AU for 34.4 flight hours, which included 19.2 hours of training and maintenance, and WUG paid rent to AU for 67.6 flight hours.  The flight log from January to October 2009 entered into evidence does not support the parties' stipulated flight hours.

[*12] transportation. During the years in issue Dr. Steinberger was the only WUG doctor who flew to rural clinics. Other WUG doctors began flying to rural clinics after the years in issue, but their flights were by/in chartered aircraft provided by the rural clinic.

The airplane was hangared at Benton Airpark,[14] which is approximately 11 miles from WUG's main office and 7.5 miles from petitioners' residence.[15] The parties stipulated that it took Dr. Steinberger approximately five minutes to ready the airplane for flight.

Dr. Steinberger began traveling to Wellington, Kansas, in 2001 and Anthony, Kansas, in 2006.[16] Wellington is 40 miles from petitioners' residence in

---

[14]Benton Airpark is also known as Lloyd Stearman Field.

[15]The parties stipulated that it took Dr. Steinberger five minutes to travel to the airpark from his residence. To reach the airpark in five minutes, Dr. Steinberger would have to drive 90 miles per hour. The parties stipulated Dr. Steinberger's travel times to Wellington and Anthony using a speed of approximately 60 miles per hour. At that rate of speed he could travel only five miles in five minutes. The Court has chosen to disregard that stipulation as an error.

[16]The parties stipulated that Dr. Steinberger started traveling to Wellington in 2000 or 2001. Exhibit 52-J is a list of cities WUG doctors traveled to and when they started traveling there. Dr. Steinberger is listed as having started traveling to Wellington in 1999. WUG was not formed until 2001. Dr. Steinberger could not have started seeing patients in Wellington in his capacity as a WUG doctor until 2001.

[*13] Wichita, and Anthony is 83 miles from their residence. It would take Dr. Steinberger approximately 40-45 minutes to drive to Wellington and approximately 35-40 minutes to fly there. It took him approximately 85-90 minutes to drive to Anthony and approximately 45-50 minutes to fly there. The parties stipulated that Dr. Steinberger alternated flying to Wellington and Anthony once a week for the years in issue.[17] He would see patients for half a day in either Wellington or Anthony and then return to Wichita to see patients for the remainder of the day.

IV.     Federal Income Tax Returns

Petitioners filed Federal income tax returns for themselves and AUI for the years in issue and for Pegasus Meadows for 2009.

A.     Petitioners' Individual Returns and Pegasus Meadows' Return

Petitioners reported combined income from WUG and the University of Kansas of $633,345, $583,358, and $572,973 on Forms 1040 for 2007, 2008, and 2009, respectively. They reported passive income from Kansas Surgery & Recovery Center, LP, South Kansas Lithotripsy, WUG Building, and Via Christie

_____

[17]According to Dr. Steinberger's 2008 flight log, he did not fly to Anthony between February 8 and August 8.

[*14] Cyberknife, LLC of $230,564, $163,687,[18] and $175,368 on Schedules E, Supplemental Income and Loss, attached to their 2007, 2008, and 2009 returns, respectively. Petitioners also reported passive losses from AUI of $172,997, $132,212, and $26,759 on the Schedules E attached to their returns for 2007, 2008, and 2009, respectively.

Additionally, petitioners reported a passive loss from Pegasus Meadows of $2,371 on the Schedule E attached to their 2009 return. Plane rental of $49,975 is reported as an other expense on Pegasus Meadows' Form 1065, U.S. Return of Partnership Income, which generated the loss petitioners reported on their 2009 Schedule E. There is no aircraft rental agreement in the record with Pegasus Meadows as a party. BKD, LLP, a Wichita accounting firm, prepared petitioners' individual returns for the years in issue and Pegasus Meadows' 2009 return.

B.    AUI's Partnership Returns

Petitioners filed Forms 1065 for AUI for the years in issue, reporting the losses they reported on the Schedules E attached to their individual returns for the

---

[18]The parties stipulated that passive income for 2008 was $161,166.

[*15] years in issue. On the 2009 Form 1065, AUI included $49,975 in its gross receipts or sales.[19] Advocate prepared all of AUI's returns for the years in issue.

On the 2007 Form 1065 "Leasing" is identified as the principal business activity, and "Aircraft" is identified as the principal product or service. Attached to the 2007 Form 1065 is an election to group AU and AUI for purposes of sections 469 (passive activity losses) and 183 (activities not engaged in for profit) signed by Dr. Steinberger.

On the 2008 and 2009 Forms 1065 "PROPERTY MGMT" is identified as the principal business activity and the principal product or service. Attached to the 2008 and 2009 Forms 1065 are elections to group AUI and WUG for purposes

---

[19]An undated, unsigned invoice from AUI to Pegasus Meadows was entered into evidence as a joint exhibit purporting to show two payments from Pegasus Meadows to AUI on December 31, 2008, of $13,408 and $17,272 and one payment on June 30, 2009, of $19,295, totaling $49,975. Dr. Steinberger testified on cross-examination that he did not prepare the invoice and did not remember seeing it before. He also testified that he thought the payments had come from his personal account because Pegasus Meadows did not have a bank account in 2009. Although Pegasus Meadows reported the $49,975 as plane expenses, Dr. Steinberger testified that the payments on the invoice were management fees for his overseeing the operations on the farmland. There was no explanation given for why two payments made in 2008 were reported as expenses for 2009. Dr. Steinberger's testimony about the $49,975 was vague, disjointed, self-serving, and contrary to what was reported on Pegasus Meadows' Form 1065, and the Court need not accept it. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

**[\*16]** of sections 469 and 183. The election for 2008 is signed by Dr. Steinberger; the election for 2009 is not signed.

V.    Notice of Deficiency and Petition to the Tax Court

Respondent issued petitioners a notice of deficiency for the years in issue determining that the airplane activity was not engaged in for profit for any of the years in issue and that they were liable for a section 6662(a) accuracy-related penalty for each year in issue. Petitioners timely petitioned the Court for redetermination.

OPINION

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to any deductions claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Under certain circumstances the burden of proof as to factual matters may shift to the Commissioner pursuant to section 7491(a). Petitioners did not argue for a burden shift under section 7491(a), and the record does not establish that the

**[*17]** prerequisites for a burden shift have been met; therefore, the burden of proof remains theirs.

I.      Section 183

Generally, the Internal Revenue Code allows deductions for ordinary and necessary expenses paid or incurred in conducting a trade or business or for the production of income. Secs. 162(a), 212(1). Under section 183, if an activity is not engaged in for profit, then no deduction attributable to that activity is allowed except as provided for in subsection (b).

To determine whether and to what extent section 183 and the regulations thereunder apply, the activity of the taxpayer must be ascertained. Sec. 1.183-1(d), Income Tax Regs. After all the facts and circumstances are taken into consideration, a taxpayer's multiple activities may be treated as one activity if the activities are sufficiently interconnected. Id. The most important factors to be considered are: (1) the degree of organizational and economic interrelationship of the undertakings, (2) the business purpose served by carrying on the undertakings separately or together, and (3) the similarity of the undertakings. Id. Generally, the Commissioner will accept the taxpayer's characterization of multiple activities as either a single activity or separate activities. Id. The taxpayer's

[*18] characterization will not be accepted, however, when it appears that it is artificial and cannot be reasonably supported by the facts and circumstances of the case. Id.

In addition to the factors provided in the regulations, the Court also considers the following factors: (1) whether the activities are conducted at the same place; (2) whether the activities were part of the taxpayer's efforts to find sources of revenue from his land; (3) whether the activities were formed separately; (4) whether one activity benefited from the other; (5) whether the taxpayer used one activity to advertise the other; (6) the degree to which the activities shared management; (7) the degree to which one caretaker oversaw the assets of both activities; (8) whether the taxpayer used the same accountant for the activities; and (9) the degree to which the activities shared books and records. See Topping v. Commissioner, T.C. Memo. 2007-92, slip op. at 15 (citing Mitchell v. Commissioner, T.C. Memo. 2006-145, slip op. at 11).

II. Whether AUI's and AU's Activities Were a Single Activity for 2007

On a statement attached to AUI's 2007 Form 1065 petitioners elected to group AUI and AU for purposes of section 183 for 2007.[20] The parties stipulated

---

[20]AU was a disregarded entity for Federal tax purposes but can still be considered a business entity. See sec. 301.7701-2(a), Proced. & Admin. Regs.

**[*19]** that AUI elected to combine its activities with WUG's activities for the years in issue. That stipulation is contradicted by the election attached to AUI's 2007 Form 1065 and signed by Dr. Steinberger, and the Court does not have to accept the parties' stipulation. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 196 (1989) (stating that the Court may disregard a stipulation of the parties if it is clearly contrary to facts disclosed by the record).

When the factors are examined, petitioners' grouping of AUI and AU as a single activity for 2007 should be allowed. AU was a disregarded entity, and AUI was its only member. AU purchased the airplane that AUI operated on a regular basis. Petitioners organized both entities at the same time, and Dr. Steinberger was the caretaker and only pilot of the airplane in 2007. He also managed the books and records for both entities. Petitioners' election to group AUI and AU for 2007 was not artificial; therefore, AUI's activity and AU's activity can be grouped as a single activity for purposes of section 183 for 2007.

III.   Whether AUI and AU's Activity Was Engaged In for Profit for 2007

Now that petitioners' activity for 2007 has been ascertained, see sec. 1.183-1(d), Income Tax Regs., the Court must decide whether the activity was entered into for profit. To decide whether a taxpayer is carrying on a trade or business so that his expenses are deductible under section 162, the Court examines whether

[*20] the taxpayer's primary purpose and intention in engaging in the activity is to make a profit. Dreicer v. Commissioner, 78 T.C. 642, 643 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one, but merely bona fide. Id.; sec. 1.183-2(a), Income Tax Regs. Whether a taxpayer expects to realize a profit is a question of fact and is resolved by examining all of the facts and circumstances of the case. Dreicer v. Commissioner, 78 T.C. at 643-644; sec. 1.183-2(a), Income Tax Regs.

The Court examines the facts and circumstances of the case using the relevant factors in section 1.183-2(b), Income Tax Regs. Dreicer v. Commissioner, 78 T.C. at 644. Those factors include: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. No one factor is determinative. Id.

[*21] After review of all the facts and circumstances of the case, it appears AUI and AU's activity was not entered into for profit for 2007, and a factor-by-factor analysis of the activity for 2007 is not warranted. Although aircraft leasing is identified as the principal business activity on AUI's 2007 Form 1065, petitioners repeatedly stated--in the stipulation of facts, through testimony, and on brief--that AUI was not in the airplane leasing business. While decrying the notion that AUI was ever in the airplane leasing business, petitioners argued that AUI's profit motive was its connections with Dr. Steinberger's medical practice and petitioners' real estate investments. AUI's business activity is not identified as property management until 2008, so the proposed profit motive of combining Dr. Steinberger's medical practice and petitioners' real estate investments was not adequately disclosed for 2007.

For 2007 AUI was not grouped with WUG for section 183 purposes. Therefore, WUG's activity for 2007 will not be examined to determine AUI and AU's profit motive for that year. According to Dr. Steinberger's 2007 flight log, AUI's flights for that year were training and maintenance flights, Dr. Steinberger's personal flights, and two flights for possible investments--one to attend a land auction on September 8, 2007, and another to inspect farmland in Ottawa, Kansas, on December 30, 2007. Petitioners made no land purchases as a result of either of

[*22] those flights, and there is no evidence in the record that petitioners owned any investment properties in 2007. The majority of AUI's flights for 2007 were either training and maintenance flights or Dr. Steinberger's personal flights. Therefore, the Court finds that AUI and AU's airplane activity was not engaged in for profit for 2007. Therefore, respondent's determination to disallow the airplane activity's flow-through loss that petitioners reported on the Schedule E attached to their 2007 return is sustained.

IV.    Whether AUI's and WUG's Activities Were a Single Activity for 2008 and 2009[21]

Petitioners argue that Dr. Steinberger and WUG had common business concerns and goals that prompted him to form AUI, acquire the airplane, and then use it to fly to rural communities served by WUG and Dr. Steinberger. They rely heavily on the cases Campbell v. Commissioner, 868 F.2d 833 (6th Cir. 1989), aff'g in part, rev'g in part T.C. Memo. 1986-569, and Morton v. United States, 98 Fed. Cl. 596 (2011).

The Court will examine each of the three factors from the regulations, with the corresponding additional factors, separately, as well as petitioners' reliance on

---

[21]Petitioners combined only Dr. Steinberger's medical activity with the airplane activity. Dr. Riva neither piloted the airplane nor flew with Dr. Steinberger during the years in issue.

[*23] <u>Campbell</u> and <u>Morton</u>.  While petitioners argue that AUI and WUG are economically intertwined, when the entire economic relationship and its consequences are examined, <u>see</u> <u>Campbell v. Commissioner</u>, 868 F.2d at 836-837, it is but a mere string that fastens the two.

A.     <u>Degree of Organizational and Economic Interrelationship</u>

Dr. Steinberger and Dr. Riva are the only members of AUI, with 75% and 25% membership interests, respectively.  WUG is a professional association with seven members, each having an equal one-seventh share.  Dr. Steinberger had a one-seventh share in WUG but was not its president during the years in issue.  Dr. Riva was not a WUG shareholder during the years in issue.

WUG was formed in 2001 and had been in existence for five years before petitioners formed AUI in 2006.  Petitioners did not consult with WUG or its president before forming AUI.  The two entities do not share books and records and do not use the same accountant.  While Dr. Steinberger is the caretaker of the airplane, he does not have the same role for WUG.  He is one of seven shareholders and not its president.  While both of the activities are based in Wichita, they are not conducted at the same place.  WUG has it own office building, and the airplane is hangared at Benton Airpark, approximately 11 miles away.

**[\*24]** In Campbell v. Commissioner, 868 F.2d at 837, the U.S. Court of Appeals for the Sixth Circuit found that the two entities involved, HCC and Health Air, had a close relationship and that their relationship established a profit motive. All of the shareholders of HCC formed the partnership Health Air and each partner executed full recourse promissory notes for the entire balance of the airplane. Id. at 835. Here, Dr. Steinberger is the only link between the two entities, and WUG played no part in acquiring the airplane.

The degree of WUG and AUI's organizational and economic interrelationship is not strong enough to support a finding that the two are a single activity under section 1.183-1(d), Income Tax Regs.

B.      Business Purpose of Conducting Activities Separately or Together

Petitioners argue that WUG and AUI had the shared business purpose of serving WUG's patients in rural Kansas communities. Another WUG doctor and shareholder testified that Dr. Steinberger started WUG's expansion of practice in rural areas. While that may be true, Dr. Steinberger's first foray into expanding WUG's practice was to start seeing patients in Wellington, Kansas, in 2001. Wellington is approximately 40 miles from Wichita, and Dr. Steinberger drove there. Dr. Steinberger added trips to Anthony, Kansas, in 2006 after AUI

[*25] purchased the airplane.  Anthony is approximately 83 miles from Wichita, and Dr. Steinberger both flew, and if weather did not permit, drove there.

During the years in issue only one other WUG doctor saw patients outside Wichita.  He drove to El Dorado, Kansas, approximately 30 miles from Wichita, to see patients there.  While more WUG doctors began seeing patients in communities other than Wichita in the years following the years in issue, it is important to note that the majority of them drove to their destinations, including one who drove to Liberal, Kansas, which is approximately 212 miles from Wichita.

Dr. Steinberger bore all of the expenses for WUG flights.  WUG deducted the rent AUI charged WUG through their hourly aircraft rental agreement from Dr. Steinberger's gross wages as a personal travel expense--just as the travel expenses for WUG doctors who drove to see patients in other communities were deducted from their wages.  Ultimately, Dr. Steinberger, personally, was financially responsible for WUG's rental expenses for the airplane.

Dr. Steinberger did not advertise the use of the airplane for WUG business.  Indeed, he was the only WUG doctor who used the airplane to travel to other communities to see patients, and the airplane was not leased to any other third parties.  Additionally, Dr. Steinberger did not use the airplane to deliver medical

[*26] supplies or equipment to rural clinics on behalf of WUG. WUG did not benefit from Dr. Steinberger's use of the airplane because he could have just as easily driven to Wellington and Anthony.

In Kurzet v. Commissioner, 222 F.3d 830 (10th Cir. 2000), aff'g in part, rev'g in part T.C. Memo. 1997-54, the U.S. Court of Appeals for the Tenth Circuit reversed in part this Court's holding that the taxpayer's expenses associated with the use of a Lear jet were unreasonable under section 162. Id. at 837. The Court of Appeals put significant weight on the time savings the taxpayers enjoyed by use of the Lear jet over commercial air travel. Id. at 836-837. There, on the basis of a factual finding of 12 hours of travel time saved with each flight on the Lear jet, the court found that the taxpayers saved 888 hours of travel time over the 74 trips they made to their Oregon timber farm. Id. at 837.

Here, Dr. Steinberger chose to fly to Wellington and Anthony, approximately 40 and 83 miles from Wichita, respectively. It was not required for him to do so. Indeed, there was testimony that it was a doctor's personal choice whether he drove or flew to see patients outside Wichita. It took Dr. Steinberger approximately 40 to 45 minutes to drive to Wellington and approximately 85 to 90 minutes to drive to Anthony. It took him approximately 35 to 40 minutes to fly to Wellington and approximately 45 to 50 minutes to fly to Anthony. The parties

[*27] stipulated that it took Dr. Steinberger five minutes to ready the airplane for flight. He made these trips once a week in alternating weeks.[22]

Dr. Steinberger's travel time to the airpark was closer to 7½ minutes rather than 5. When his travel time to the airpark and the time to ready the airplane for flight are added to the stipulated flight times, Dr. Steinberger saved no time by flying to Wellington--in fact it took longer than driving--and less than an hour for a round-trip flight to Anthony. These are not substantial time savings that would justify Dr. Steinberger's flying as opposed to driving to Wellington and Anthony. See Kurzet v. Commissioner, 222 F.3d at 837. There was no change in the amount of time Dr. Steinberger spent in Wellington and Anthony whether he drove or flew--he was there for half of the day and then returned to Wichita to see patients there.[23]

WUG did not benefit from Dr. Steinberger's use of the airplane. Dr. Steinberger simply used the airplane to travel to Wellington and Anthony. All

---

[22]See supra note 17.

[23]Petitioners presented no evidence about the number of patients Dr. Steinberger saw in Wellington and Anthony on days that he flew versus days that he drove. The only evidence presented was that he spent half a day in each location before returning to Wichita to see more patients.

[*28] expenses related to the use of the airplane for those flights were deducted from his gross income as personal expenses.

Petitioners also argue that the facts here are "strikingly similar" to the facts of Morton, 98 Fed. Cl. 596. There, the taxpayer was the creator of the Hard Rock brand and a cofounder of the Hard Rock Cafe chain. Id. at 597. He created a C corporation and several S corporations, of which he was either the majority shareholder or the only shareholder, to manage his business. Id. One such entity was Red, White and Blue Pictures, Inc. (RWB). Id. RWB owned the real estate on which several Hard Rock Cafes were built and acted as the landlord for those cafes. It also owned the airplanes to which the disallowed deductions related. Id. at 597-598. The taxpayer used the airplanes to fly from the Hard Rock headquarters in Los Angles, California, to the Hard Rock Hotel and Cafe in Las Vegas, Nevada, and to various other cities to conduct meetings where future Hard Rock hotels or casinos possibly would be built. Id. at 598. There, the argument, with which the U.S. Court of Federal Claims agreed, was that all of the taxpayer's entities were operated as a "unified business enterprise." Id. at 599.

Dr. Steinberger's business affairs for the years in issue were far from "strikingly similar" to the facts of Morton. Dr. Steinberger was a one-seventh owner of a medical practice, and he and his wife were the only members of an

[*29] LLC that owned an airplane that he used to travel to two rural Kansas cities close to Wichita, where WUG was based. In <u>Morton</u> the taxpayer was the majority or only shareholder of several corporations, each used to control certain aspects of his business. Additionally, the entity that owned the airplane, RWB, did more than just own the airplane--it also owned the real property on which several of the Hard Rock Cafes were built and served as the landlord of those cafes. Petitioners have failed to show that WUG and AUI shared the characteristics of a unified business enterprise as the entities did in <u>Morton</u>.

### C. Similarity of Activities

The similarity of the activities will also be examined to determine whether two activities should be treated as a single activity. Here, there are no similarities between the two activities. One is a medical practice specializing in urology. The other involved an airplane Dr. Steinberger purchased because he enjoyed flying and personally preferred to fly instead of to drive to Wellington and Anthony.

### D. Conclusion

The Court finds that petitioners' characterization of AUI and WUG as a single activity is artificial and not supported by the facts and circumstances of the case.

[*30] V.     AUI's Airplane Activity Examined on Its Own

Petitioners argue in the alternative that if AUI and WUG are not a single activity for section 183 purposes, AUI on its own was engaged in for profit during 2008 and 2009.

AUI's activity on its own is examined under the same factors used to examine AUI and AU's activity for 2007.  See supra pp. 20-21.  A review of all of the facts and circumstance and the entire record shows that AUI was not engaged in the airplane activity to make a profit and that a detailed factor-by-factor analysis is unnecessary.

The analysis of AUI's activity on its own for 2008 and 2009 is almost the same as the analysis of AUI and AU's activity for 2007--the majority of flights were training and maintenance and personal flights.  Petitioners did own farmland in Iowa in 2008 and 2009, but their argument for how much time was spent there is not supported by the record.  The parties' stipulation of two to three flights a year to Iowa is contradicted by Dr. Steinberger's flight logs entered into evidence.  See supra note 12.  Additionally, as petitioners stated numerous times, AUI was not in the airplane rental business.

Furthermore, Dr. Steinberger certainly took personal pleasure in flying.  He has been a licensed pilot for as long as he has been a licensed physician, and he

[*31] testified that he preferred flying to as opposed to driving to Wellington and Anthony. On the basis of this record, the Court finds that AUI was not engaged in the airplane activity for profit for 2008 and 2009. Therefore, respondent's determination to disallow the airplane activity's flow-through losses that petitioners reported on the Schedules E attached to their 2008 and 2009 returns is sustained.

VI.    Accuracy-Related Penalties

Respondent determined section 6662(a) penalties of $13,478.60, $9,780.40, and $3,269.20 for 2007, 2008, and 2009, respectively.

Section 6662(a) and (b)(1) and (2) authorizes a 20% penalty on the portion of an underpayment of income tax attributable to: (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax. Under section 7491(c), the Commissioner bears the burden of production with regard to penalties. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner has met the burden of production, the taxpayer has the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447; Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), aff'g T.C. Memo. 1982-337.

**[\*32]** There is a "substantial understatement" of income tax for any year if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the tax return or $5,000. Sec. 6662(d)(1)(A); Higbee v. Commissioner, 116 T.C. at 448.

Here, the understatements of income tax are $67,393, $48,902, and $16,346 for 2007, 2008, and 2009, respectively, which are greater than 10% of the tax required to be shown on the returns, which in turn is greater than $5,000 for each year. Thus, the understatement for each year in issue is substantial for purposes of the section 6662(a) accuracy-related penalty. The Court concludes that respondent met his burden of production in showing that petitioners substantially understated their Federal income tax for 2007, 2008, and 2009.

Pursuant to section 6664(c)(1), no penalty shall be imposed under section 6662 with regard to any portion of an underpayment if it can be shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Whether a taxpayer acted with reasonable cause and in good faith is decided on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his proper tax liability. Id.; see also Remy v. Commissioner, T.C. Memo. 1997-72.

[*33] Reasonable cause requires a taxpayer to have exercised ordinary business care and prudence as to the disputed item. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000) (citing United States v. Boyle, 469 U.S. 241 (1985), Hatfried, Inc. v. Commissioner, 162 F.2d 628, 635 (3d Cir. 1947), Girard Inv. Co. v. Commissioner, 122 F.2d 843, 848 (3d Cir. 1941), and Estate of Young v. Commissioner, 110 T.C. 297, 317 (1998)), aff'd, 299 F.3d 221 (3d Cir. 2002). Good-faith reliance on the advice of an independent, competent professional about the tax treatment of an item may meet this requirement. Id. To reasonably rely on a professional's advice, a taxpayer must prove by a preponderance of the evidence that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Id. at 99.

Petitioners' individual Federal income tax returns for the years in issue were prepared by BKD, LLP. BKD did not prepare AUI's partnership returns and was not associated with any aspect of the purchase or use of the airplane besides including AUI's losses on the Schedules E attached to petitioners' returns for the years in issue and including a plane rental expense on Pegasus Meadows' 2009 Form 1065. Consequently, the Court will analyze petitioners' reliance on a

[*34] professional's advice claim by examining Advocate's advice to petitioners about the grouping of AUI and AU for 2007 and the grouping of AUI and WUG for 2008 and 2009 and the use of the airplane.

Advocate specializes in assisting taxpayers who wish to purchase and use an airplane for business purposes. It is made up of attorneys, CPAs, and tax advisers and has been in existence in some form or another since the late 1990s. Advocate was a competent professional with sufficient expertise to justify reliance upon its advice.

Petitioners provided Advocate with the airplane flight logs for each year in issue and other required documentation to prepare AUI's returns. A partner at Advocate testified that AUI's returns were driven by the airplane's flight logs more than any other document. Advocate prepared AUI's returns and advised grouping AUI and AU as a single activity for 2007 and AUI and WUG as a single activity for 2008 and 2009 for section 183 purposes.

A.  2007

Although the parties stipulated that AUI elected to combine its activities with WUG's for the years in issue, the record makes it clear that AUI elected to group AUI and AU for section 183 purposes for 2007. See supra pp.18-19.

[*35] Petitioners made no argument at trial or on brief that the election to group AUI and AU as a single entity for purposes of section 183 was based on a good-faith reliance on Advocate's professional advice; their entire argument focused on the grouping of AUI and WUG. Therefore, the accuracy-related penalty for 2007 must be deemed conceded. See Rule 142(a); Murphy v. Commissioner, 103 T.C. 111, 119 (1994) (citing Rothstein v. Commissioner, 90 T.C. 488, 497 (1988)). Even if petitioners had not conceded the accuracy-related penalty for 2007, the Court would still find them liable for the penalty. All of the flights AUI operated in 2007 except two were training and maintenance flights and Dr. Steinberger's personal flights. The Court found that AUI and AU as a single activity was not entered into for profit.[24] Therefore, petitioners are liable for an accuracy-related penalty for a substantial understatement of income tax for 2007.

B. 2008 and 2009

Petitioners did, however, rely in good faith on Advocate's professional advice to group AUI's and WUG's activities for 2008 and 2009. Petitioners had no reason to doubt Advocate's advice about grouping AUI and WUG for purposes of section 183 and were not required to seek a second opinion on the matter. See

[24]Although petitioners made no argument that AUI was engaged in for profit on its own for 2007, the Court would find, as it did for 2008 and 2009, that AUI's activity on its own was not engaged in for profit for 2007.

**[\*36]** <u>Boyle</u>, 469 U.S. at 251 ("To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place." (citing <u>Haywood Lumber & Mining Co. v. Commissioner</u>, 178 F.2d 769, 771 (2d Cir. 1950))).

Petitioners have met each requirement of the three-prong test for reliance on the advice of a professional, and they exercised ordinary business care and prudence in reliance on Advocate's advice for 2008 and 2009. Therefore, the Court finds that petitioners had reasonable cause for grouping AUI and WUG as a single activity for section 183 purposes, and no section 6662(a) accuracy-related penalty shall be imposed for 2008 or 2009.[25]

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

---

[25]Respondent included boilerplate language in the notice of deficiency that petitioners were liable for accuracy-related penalties for the years in issue because of negligence, a substantial understatement of income tax, or a valuation misstatement. A valuation misstatement was not in issue here. The parties' arguments focused on whether petitioners had reasonable cause for relying on Advocate's advice. Because the Court finds they did not have reasonable cause for their 2007 substantial understatement of income tax but did have reasonable cause for grouping AUI and WUG for 2008 and 2009, there is no need to discuss whether petitioners were negligent for purposes of sec. 6662(a).

**[*37]** To reflect the foregoing,

<u>An appropriate decision</u>

<u>will be entered</u>.